**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KIMBERLY A. ESTERS,

    *Plaintiff*,

  v.           Civil Action No. 1:18-cv-02547 (CJN)

KIRSTJEN M. NIELSEN, Secretary of the
U.S. Department of Homeland Security

    *Defendant*.

## <u>MEMORANDUM OPINION</u>

Kimberly Esters was a Management and Program Analyst ("MAPA") employed by the Department of Homeland Security.  Compl. ¶¶ 21–22, ECF No. 1.  After a series of disputes with her supervisor, she sued DHS for discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Title VII), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a).  *See generally* Compl. Following discovery, DHS moved for summary judgment.  *See generally* Def.'s Mot. for Summ. J. ("Mot."), ECF No. 18.  For the following reasons, the Court grants summary judgment for DHS on all of Plaintiff's claims.

### I.  Background

Esters's work troubles began during her time as an employee in DHS's Office of Cyber and Infrastructure Analysis ("OCIA").  Compl. ¶ 21.  In March 2013, Esters submitted a request to telework in order to care for her sick mother.  *Id.* ¶ 27.  Her first-line supervisor, Rick Bosarge, granted her initial request.  *Id.*  But Bosarge later spoke with his supervisor, Tommy Brown, who informed Bosarge that OCIA policy did not permit employees to telework in order to care for

dependents.  *Id.*  ¶¶ 28–29.  Following his conversation with Brown, Bosarge denied Esters's request to continue teleworking.  Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s SOMF") ¶¶ 9, 12, 27, ECF No. 19-1.  While Esters acknowledges that OCIA's formal policy did not permit dependent care,[1] she asserts that OCIA actually practiced an informal policy in which telework approval was left to the manager's discretion.  Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n") at 11– 12, ECF No. 19.  In particular, Esters alleges that two other employees were permitted to telework while caring for dependents, the first while on maternity leave, *id.*, and the second to care for his wife after surgery, *id.* at 11.

Later that year, Esters met with Brown and a second employee for her mid-year review, where she was informed that she was on track to receive a score of 3.6 to 3.7 for her upcoming performance evaluation.  Pl.'s Opp'n at 12–13; Compl. ¶ 34.  Her ultimate score, however, was 3.1.  Compl. ¶ 31.  Esters alleges that she requested a meeting with Brown to discuss her lower-than-expected score but Brown refused to meet with her.  *Id.* ¶ 36.  Thereafter, Esters sent an email "up the chain of command" detailing her concerns regarding her performance evaluation.  *Id.* ¶ 37. After learning that Esters had sent her email, Brown said to Esters "I thought we talked about how you need to handle matters with your performance evaluation.  I told you how you could work on communication skills with Rick."  *Id.* ¶ 40.

Esters asserts that Brown became increasingly "negative and harassing" toward her in the following months.  Compl. ¶ 43.  She identifies at least five encounters with Brown during which he demonstrated hostile behavior.  In February 2014, Brown spoke harshly to Esters in the presence of other DHS employees.  *Id.* ¶ 44.  In May 2014, Brown approached Esters on three separate

---

[1] In 2012, Esters signed a telework agreement that permitted her to request situational telework as needed.  Pl.'s SOMF ¶ 7.

occasions, the first time to yell at her regarding a "one-pager" missing from his notebook, *id.* ¶ 45; the second time to yell at her about hiding information from his executive assistants, staying in her cubicle, and not processing his travel expense report, *id.* ¶¶ 51–52; and the third time to confront her about his travel voucher in what Esters describes as a "hostile and badgering tone," *id.* ¶ 53. Esters also alleges that Brown tried to embarrass her on other occasions by raising his voice and asking her questions that she wouldn't be able to answer as a new contracting officer representative.  *Id.* ¶ 57.  Finally, Esters asserts that Brown made clear that she would never be promoted.  *Id.* ¶ 59.

In June 2014, Esters filed an informal EEO complaint.  Compl. ¶ 58.  She alleges that, over the next several months, her supervisors retaliated against her for her protected EEO activity and continued to discriminate against her by failing to promote her despite performing duties performed by individuals with higher GS levels, denying her the opportunity to compete for a position, and failing to select her for two MAPA positions.  In particular, she alleges that Brown attempted to intimidate her by asking if she was "'being prevented from filing an EEO' complaint," *id.* ¶ 74, and telling her that he had heard she was "having problems," *id.*; that Brown initiated a gap analysis to promote another analyst from a GS-11 to a GS-12 but no such gap analysis was requested for her (she was a GS-9 at the time), *id.* ¶¶ 71–72; Pl.'s Opp'n 13–14; that during the relevant period, she performed some of the same duties as another employee who was working as a GS-13, Pl.'s Opp'n at 14; that after she left her position, her replacement was hired as a GS-12, Compl. ¶ 73; that DHS did not consider her for a GS-11 MAPA position that it filled, *id.* ¶¶ 60–61; Pl.'s SOMF ¶ 52; and that she was not selected for two management positions for which she applied, Pl.'s Opp'n at 14–15.

Case 1:18-cv-02547-CJN   Document 23   Filed 02/24/21   Page 4 of 17

On a final note, Esters contends that she was required to work without a position description and perform duties outside of her job classification. Compl. ¶ 41. At her deposition, Esters clarified that Brown did sign a position description for her position in 2011, Mot. Ex. 7 at 71–76,[2] ECF No. 18-11, and that her claim is actually that she was assigned human capital tasks that were not her responsibility, *id.*

## II.   Legal Standard

Absent evidence of direct discrimination, disparate-treatment claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 493–94 (D.C. Cir. 2008); *Jones v. Bernanke,* 557 F.3d 670, 677 (D.C. Cir. 2009). A plaintiff establishes a *prima facie* discrimination claim by alleging that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). For a retaliation claim, a plaintiff must allege that (1) she engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse action. *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)).

Once a plaintiff establishes a *prima facie* claim,[3] the burden shifts to the employer to articulate some legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action. *Jones*, 557 F.3d at 677. This burden is "merely one of production" in

---

[2] This Exhibit contains Esters's deposition transcript and includes pagination for the Exhibit itself as well as page numbers provided within the transcripts. The Court cites to the transcript page numbers.

[3] The Supreme Court recently held in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), that a plaintiff bringing an ADEA claim is only required to show that age discrimination was a but-for cause of the differential treatment; the plaintiff does not necessarily need to show that age discrimination was a but-for cause of the personnel decision itself. *See also Kline v. Weichert*, 2020 WL 2615528, at *4 (D.D.C. May 23, 2020).

which an employer must produce evidence "sufficient for the trier of fact to conclude" that the action was taken for the provided reason. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006).  An employer's explanation for the challenged action must be "clear and reasonably specific." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).  "This obligation arises both from the necessity of rebutting the inference of discrimination arising from the *prima facie* case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." *Id.*; *see also Oates v. District of Columbia*, 824 F.2d 87, 91 (D.C. Cir. 1987).  But this intermediate burden does not require the employer to introduce evidence that, absent any evidence of pretext, would persuade the trier of fact that the employment action was lawful.  *Burdine*, 450 U.S. at 257; *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) (employer not required to support reasons with objective evidence sufficient to satisfy preponderance of the evidence standard; at all times the plaintiff retains ultimate burden of persuasion).

When the employer proffers a sufficiently clear and specific reason, the "central question" at summary judgment becomes whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, [age,] or national origin[.]" *Brady*, 520 F.3d at 494 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 511 (1993); *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–16 (1983)); *Bilal-Edwards v. United Planning Org.*, 15 F. Supp. 3d 1, 11–12 (D.D.C. 2013) (similar analysis for ADEA claim).  The plaintiff may make this showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

5

*Burdine*, 450 U.S. at 256.  Either way, the plaintiff is required to show "*both* that the reason was false, *and* that discrimination was the real reason.""  *Hicks*, 509 U.S. at 515.

Whether evidence proffered to show pretext is sufficient to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry.  *See Aka*, 156 F.3d at 1294 ("[I]t is difficult, if not impossible, to say in any concise or generic way under what precise circumstances such an inference will be inappropriate.").  The Court of Appeals has identified several factors that may support an inference of pretext, including the employer's (1) preferential treatment of similarly situated employees outside the plaintiff's protected group; (2) inconsistent or dishonest explanations; (3) deviation from established procedures or criteria; (4) pattern of poor treatment of other employees within the same protected group as the plaintiff; (5) the temporal proximity between an employee's protected activity and the employer's adverse action; and (6) other relevant evidence that a jury could consider to reasonably conclude the employer acted with an illicit motive.  *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015).

The ultimate question is whether "a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  *Mastro*, 447 F.3d at 855; *Holcomb v. Powell,* 433 F.3d 889, 896 (D.C. Cir. 2006) (quoting *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir. 2003)).  All of the evidence includes "any combination of (1) evidence establishing the plaintiff's *prima facie* case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer."  *Mastro*, 447 F.3d at 855 (quoting *Holcomb,* 433 F.3d at 896).

### III.    Analysis

Counts I–III and V of Esters's Complaint allege discrimination by DHS on the basis of race, sex, and age.  *See generally* Compl.  Count IV of the Complaint includes a claim for retaliation against protected EEO activity.  *Id.*

Esters alleges several adverse employment actions as the bases for her discrimination and retaliation claims:   (1) denial of her telework request; (2) her 2013 performance evaluation; (3) being forced to work without or outside of a position description; (4) failure to promote her to a higher GS level; (5) failure to select her for a MAPA position to which she applied in 2014; and (6) being subjected to a hostile work environment.  Because all of her claims are based in whole or in part on some or all of these actions, the Court examines each alleged action in turn.  (The Parties' briefs are hardly models of clarity, and the Court has adopted this organization to provide some coherence to the issues.)

Telework Denial

Esters alleges that her request to continue teleworking was denied while other employees were allowed to telework to care for family.  Pl.'s Opp'n at 11–12.  DHS argues that her request was denied because OCIA policy does not permit employees to telework in order to care for dependents.  Def.'s Mem. Supp. Mot. ("Def.'s Mem.") at 9, ECF No. 18-2.

It is not apparent that the denial of Esters's request to continue teleworking constitutes an adverse employment action.   An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."   *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  The action must "affect[ ] the terms, conditions, or privileges of employment or future

employment opportunities." *Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev., Office of Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017).  And an employee must experience those consequences "such that a reasonable trier of fact could find objectively tangible harm."  *Douglas*, 559 F.3d at 552 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)); *see also Taylor*, 350 F.3d at 1293 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)) (defining "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits").

In general, "an employee's request to work from home on a few occasions, without more, does not constitute an adverse employment action under Title VII." *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 41 (D.D.C. 2013); *see Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010) ("Being denied the ability to work from home on, at most, three occasions is a minor annoyance, not an adverse action.").  Decisions in this District, however, have distinguished between the denial of an initial telework request and the suspension of an existing telework arrangement.  *See Saunders v. Mills*, 172 F. Supp. 3d 74, 101 (D.D.C. 2016).  It is unclear whether this distinction makes sense, but in any event, a reasonable inference here is that DHS denied Esters's request to continue teleworking, knowing that she wished to telework so she could care for her mother.  Pl.'s SOMF ¶ 26; Pl.'s Opp'n at 11–12.  It may be that a jury could decide that the denial caused her tangible harm.

But Esters must do more than show that she suffered an adverse employment action; the action must also be discriminatory, and DHS contends that Esters's telework request was against OCIA policy.  Def.'s Mem. at 9.  To be sure, Bosarge initially approved her two-week telework request when he assumed Esters wished to care for her mother, but Bosarge later spoke with *his*

8

supervisor, was told the request was inconsistent with OCIA policy, and ultimately declined to extend Esters's telework period. Def.'s Reply Supp. Mot. (Def.'s Reply) at 3–4, ECF No. 20.

Following employer policy certainly constitutes a legitimate reason to deny an employee's telework request. And even if Bosarge knew that Esters made the request so she could care for her sick mother when he approved the initial request, declining her request to continue teleworking after having a conversation with a higher-level supervisor about how the arrangement went against OCIA policy does not, without more, cast doubt on DHS's proffered legitimate reason.

Esters argues, however, that OCIA actually has an informal policy permitting telework for dependent care and that it approved such arrangements for two other employees. Pl.'s Opp'n at 11–12. In order to survive summary judgment on a pretext argument, Esters may show that "similarly situated employees" experienced different treatment. *Walker v. McCarthy*, 170 F. Supp. 3d 94, 107–08 (D.D.C. 2016). Such evidence gives rise to an inference that the employer treated other employees outside the protected class "more favorably in the same factual circumstances," suggesting that Esters was treated less favorably on account of her protected status. *Id.* (citing *Brady*, 520 F.3d at 495). To raise such an inference, however, the plaintiff must "demonstrate that 'all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee[s].'" *Id.* (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)).

Similarly situated employees tend to share similar jobs and job duties, deal with the same supervisor, and experience similar responses to similar conduct. *See Walker*, 170 F. Supp. 3d at 108 (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016)). The question of whether employees are similarly situated ordinarily presents a question of fact for the jury. *George*, 407 F.3d at 414. At the summary judgment stage, however, where a plaintiff relying

on comparator evidence fails to produce "evidence that the comparators were actually similarly situated to [her], an inference of falsity or discrimination is not reasonable," and summary judgement is appropriate. *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (internal quotation marks omitted) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995–96 (D.C. Cir. 2002)).

Esters has failed to demonstrate that either of the other employees mentioned in her brief qualifies as a similarly situated employee. The first teleworked while *on parental leave*, Pl.'s Opp'n at 11, and was therefore in a much different position than Esters, who was not on parental leave and whose request was to telework instead of coming into the office (rather than to telework instead of being on leave). As for the second employee, Esters provides absolutely no evidence (other than the timing of his telework request) to support her assertion that he teleworked for the purpose of caring for a dependent. *Id.* at 11–12. Her bare assertion that this second employee was approved to telework for that reason is, without more, insufficient to demonstrate that they were similarly situated and therefore does not give rise to an inference of pretext. As Esters has failed to show that "a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason," *see Mastro*, 447 F.3d at 855, her claims cannot survive summary judgment on the basis of the telework denial.

<u>Performance Evaluation</u>

Esters relies next on receiving a score of 3.1 on her 2013 performance evaluation, despite being previously told she would receive a higher score. Pl.'s Opp'n at 12–13. DHS responds that Esters's performance evaluation cannot qualify as an adverse employment action because no awards were given that year due to sequestration and, in the alternative, dissatisfaction with Esters's work is a legitimate reason for the score. Def.'s Mem. at 16–18.

To qualify as materially adverse, a performance evaluation must "affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008)). Generally, the key factor that qualifies an evaluation as materially adverse is the existence of some financial or professional harm that flows directly from the evaluation itself. *Roberts v. Scalia*, No. 19-cv-00474, 2020 WL 1892057, at *10 (D.D.C. Apr. 16, 2020); *see also Walker*, 798 F.3d at 1090, 1095; *Moore v. Pritzker*, 204 F. Supp. 3d 82, 87–88, 92 (D.D.C. 2016) (finding material adversity when employee's performance evaluation directly determined amount received on her year-end bonus).

DHS has proffered evidence that no bonuses were issued to anyone in OCIA in 2013 due to the sequestration.  Esters has not countered that evidence, nor has she provided any evidence of how her performance evaluation otherwise affected her in a materially adverse way.  Because she has not identified any way in which the performance evaluation affected her "position, grade level, salary, or promotion opportunities," *see Taylor*, 571 F.3d at 1321, she has failed to demonstrate that it qualifies as an adverse employment action.

<u>Position Description</u>

Esters's claims are also partially based on her contention that she was forced to work without a position description and to perform duties outside of her position description.  Compl. ¶¶ 41, 77, 93, 111, 124.  But she concedes that a position description was created for her position in 2011, Pl.'s SOMF ¶ 5; *see also* Mot. Ex. 5, ECF No. 18-9, and acknowledges that the MAPA position description was broad and a sort of "catch-all."  Mot. Ex. 7 at 76.  Her claim therefore boils down to an assertion that she was asked to perform certain human capital duties that she had

not performed in the past and did not initially expect to perform.  *See* Pl.'s SOMF ¶ 53; Mot. Ex. 7 at 71–76.

But Esters's claim that she was forced to perform duties that fell outside of her position description is unsupported by the record and fails to demonstrate that she was subjected to an adverse employment action.  Although Esters might have not regularly performed human capital tasks, she proffers no evidence that she was actually assigned responsibilities that fell outside the MAPA position description.  In fact, Esters admitted that another MAPA regularly performed human capital work.  Mot. Ex. 7 at 75–76.  Because Esters cannot show that she was forced to work without a position description or outside of her position description, she cannot show that she suffered an adverse employment action as a result of her position description and work assignments.

<u>Failure to Promote</u>

Esters further asserts that she was not given a temporary promotion during a time in which she performed duties shared by other employees of a higher grade.  Pl.'s Opp'n at 13.  Esters argues that, during the relevant period, she performed some of the same duties as another employee (Tequilla Clemons) who was working as a GS-13, *id.* at 14; that another employee (Snyder) was selected for a GS-11 MAPA position in 2014, Compl. ¶¶ 60–61; and that her own replacement was hired as a GS-12, *id.* ¶ 73.  DHS responds that Esters never requested a promotion and that, in any event, she was not similarly situated to the employees she identifies as comparators.  Def.'s Mem. at 19.

Summary judgment is appropriate for the temporary-promotion component of Esters's claims because she has failed to demonstrate that she was similarly situated to those employees she has proffered as comparators.  As to Clemons, Esters asserts only that certain of her job duties

overlapped with Clemons's; Esters does not allege (let alone proffer evidence) that they performed identical, or close-to-identical, jobs.  Pl.'s SOMF ¶ 50.  The comparison to Snyder fares no better; Snyder was selected for his position under a hiring process designed to non-competitively appoint individuals who have a severe disability.  *Id.* ¶ 52.

<u>Failure to Select for MAPA Position</u>

Esters's claims are also based on DHS's failure to select her for management positions to which she applied in 2014.  *See generally* Compl., Counts I–IV.  That November, Esters applied to Vacancy Announcement No. FS-1244694-AC15, which announced the availability of up to three Management and Program Analysts in various divisions.  Pl.'s SOMF ¶ 54; Compl. ¶ 66.  Applicants were interviewed by a selection panel consisting of Bosarge (Caucasian male); Sylvonica Madlock (African-American female); David Sun (Asian male); and Anthony Dattilo (Caucasian male).  Pl.'s SOMF ¶¶ 55–56.  During the interview, each candidate was asked the same set of questions to determine his or her suitability for the position.  *Id.* ¶ 57.  Esters was not selected.  Compl. ¶ 70.

Esters alleges the selection panel discriminated against her due to the panelists' friendships with Tommy Brown, but this allegation is unsubstantiated.  The record demonstrates that Brown "deferred" to Bosarge to constitute the selection panel and make a hiring recommendation, Pl.'s SOMF ¶ 70, and Bosarge testified during his deposition that he did not recall Brown speaking with any of the panelists about their interview with Esters, *id.* ¶ 71.  Esters has not proffered any evidence that Brown influenced the panel's decision, nor that Brown acted with discriminatory intent regarding his adoption of the panel's recommendation, and her claim is supported by nothing other than her own speculation.  *See Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere

unsubstantiated allegation . . . creates no 'genuine issue of fact' and will not withstand summary judgment." (citation omitted)).

Esters also contends that she was better qualified for a management position than the selectee, thus establishing an inference of pretext. Pl.'s Opp'n at 14–15. DHS argues that the panel did not recommend Esters because the selectee scored higher than her throughout the interview. Def.'s Mem. at 12.

"[W]hen an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly better qualified* for the job' than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (emphasis added) (quoting *Holcomb*, 433 F.3d at 897). "In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka*, 156 F.3d at 1294. As a result, the "qualifications gap must be great enough to be inherently indicative of discrimination." *Adeyemi*, 525 F.3d at 1227 (internal quotation marks and citation omitted). Esters has failed to show that such a gap exists here. She argues that the individual eventually selected for the position was not qualified because he did not have a "COR level II" certification that Esters contends was required for the position. Pl.'s Opp'n at 14. But there is no evidence to support the proposition that a COR level II certification was a requirement for the position, Mot. Ex. 26, ECF No. 18-30, and Esters herself admitted that such certification could have been acquired after the selectee was chosen for the job, Mot. Ex. 7 at 80.

More important, DHS has provided substantial evidence supporting the panel's determination that the selectee had "scored consistently higher" in his interview than Esters. Def.'s

14

Mem. at 16.  Esters does not contradict any of this evidence, leaving it unrebutted for purposes of summary judgment.  *See Angelex, Ltd. v. United States*, 907 F.3d 612, 618 (D.C. Cir. 2018) (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)) (noting that, to survive summary judgment, non-moving party must produce evidence allowing reasonable factfinder to return verdict in its favor).  Esters can establish that she was *qualified* for the position—a point DHS agrees with.  *See, e.g.*, Def.'s Reply at 11 ("[There is no] dispute that Plaintiff was 'qualified' for the position, as she was ultimately referred for an interview by the selection panel.").  But she has not demonstrated that she was "*significantly better qualified* for the job," *Adeyemi*, 525 F.3d at 1227 (emphasis added) (internal quotation marks and citation omitted), such that pretext can be inferred.

Hostile Work Environment

In addition to the specific actions discussed above, Esters also alleges that DHS fostered a hostile work environment.  Compl. ¶¶ 122–133.  To survive summary judgment on such a claim, Esters "must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In identifying the actions she alleges constituted abuse, Esters repeats the behavior underlying her other claims and adds to that list several altercations between herself and Brown, as well as an altercation with another employee.  Pl.'s Opp'n at 18–19.  But even if all of those allegations are true, they are not enough to support a hostile work environment claim.

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Sporadic incidents of rude or unprofessional behavior are not enough—severe or pervasive means just that. *Barbour v. Browner*, 181 F.3d 1342, 1348–49 (D.C. Cir. 1999) (insulting gesture from a colleague and a supervisor's intentionally slow response to employee's question were insufficient to support a finding of hostile work environment); *see also Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006) (denied promotion, lower performance evaluations, demotion, and reduced autonomy insufficient); *Baloch*, 550 F.3d at 1201 (demanding medical documentation for all sick leave, threatening suspension, issuing letter of reprimand and unsatisfactory performance review, and "profanity-laden yelling" insufficient). When hostile work environment allegations survive summary judgment, the abuse is usually quite severe. *See, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 528–29 (D.C. Cir. 2003) (failure to promote, failure to provide necessary tools, relegation to an unheated and poorly lit storage room for a year and a half despite available office space, failure to create a job description and then measuring performance against arbitrary standards for six years *may* be sufficient); *Barbour*, 181 F.3d at 1348 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (repeated sexual assault sufficient)).

While the actions here may have been distasteful, Esters cites to no analogous cases to support her contention that the conditions she faced were so "extreme [as] to amount to a change in the terms and conditions of [her] employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The incident in which another employee yelled at Esters was an isolated incident that management addressed. Pl.'s SOMF ¶¶ 82–84. And although Brown's conduct may have been impolite and embarrassing to Esters, it does not rise to the level necessary to find the existence of a hostile work environment. For these reasons, Esters's hostile work environment claim also fails.

**IV.    Conclusion**

Because no reasonable juror could find, based on the present record, that Esters suffered discrimination on the basis of her race, sex, or age, nor that she was subjected to a hostile work environment or retaliated against for protected EEO activity, the government is entitled to summary judgment on all claims.  DHS's Motion for Summary Judgment is therefore **GRANTED**. An Order will be entered contemporaneously with this Memorandum Opinion.


DATE:  February 24, 2021

CARL J. NICHOLS
United States District Judge